**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN  DIVISION**

| | | |
|---|---|---|
| STEPHANIE SYLVERNE,<br>and ALMA DAVIS,<br>on behalf of plaintiffs  and a class,<br><br>Plaintiffs,<br><br>v.<br><br>MIDLAND FUNDING NCC-2 CORP.,<br>MIDLAND FUNDING LLC,<br>MIDLAND CREDIT<br>    MANAGEMENT, INC.,<br>and ENCORE CAPITAL GROUP, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br><br>JURY DEMANDED |

**FILED**

**FEBRUARY 11, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**PH**

**08 C 875**

**JUDGE NORGLE
MAGISTRATE JUDGE COLE**

<u>**COMPLAINT  – CLASS ACTION**</u>

<u>**MATTERS COMMON TO MULTIPLE COUNTS**</u>

<u>**INTRODUCTION**</u>

1.      Plaintiffs Stephanie Sylverne and Alma Davis bring this action to secure redress against unlawful credit and collection practices engaged in by defendants Midland Funding NCC-2 Corporation ("NCC"), Midland Funding LLC ("MFLLC"), Midland Credit Management, Inc. ("MCM"); and Encore Capital Group, Inc., formerly known as MCM Capital Group, Inc. ("Encore").  Plaintiffs allege violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"), and state law.

2.      The FDCPA broadly prohibits unfair or unconscionable collection methods;  conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements, in connection with the collection of a debt; it also requires debt collectors to give debtors certain information.  15  U.S.C. §§1692d, 1692e, 1692f and 1692g.

3.      Plaintiffs complain of the systematic filing of perjured affidavits in state court collection lawsuits for the purpose of obtaining the ministerial entry of default judgments. The fraudulent nature of the affidavits is shown by the fact that two affidavits filed in two

1

unsuccessful state court lawsuits filed against plaintiff Sylverne concerning the same debt contained patently inconsistent information.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction under 28 U.S.C. §§1331, 1337 and 1367  and 15 U.S.C. §1692k (FDCPA).

5.     Venue and personal jurisdiction over defendant in this District is proper because defendants' collection actions occurred here.

## PARTIES

### Plaintiffs

6.     Plaintiff Stephanie Sylverne is an individual who resides in the Northern District of Illinois.

7.     Plaintiff Alma Davis is an individual who resides in the Northern District of Illinois.

### Midland Funding NCC-2 Corporation

8.     Defendant Midland Funding NCC-2 Corporation ("NCC") is a Delaware corporation.  Its principal place of business is 8875 Aero Drive, Suite 200, San Diego, CA 92123.  Its address for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

9.     Defendant NCC is in the business of taking title to charged-off debts allegedly owed by consumers, including large amounts of credit card debts, for a small fraction of face value and enforcing the debts against the consumers.

10.     Defendant NCC has been the plaintiff in more than 1,000 collection actions against Illinois residents.

11.     Defendant NCC is a "debt collector" as defined in the FDCPA.

12.     Defendant NCC transacts business in Illinois.

13.     On information and belief defendant NCC has no employees.

2

**Midland Funding LLC**

14.      Defendant Midland Funding LLC ("MFLLC") is a limited liability company chartered under Delaware law.   Its principal place of business is 8875 Aero Drive, Suite 200, San Diego, CA 92123.  Its address for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

15.      Defendant MFLLC is in the business of taking title to charged-off debts allegedly owed by consumers, including large amounts of credit card debts, for a small fraction of face value and enforcing the debts against the consumers.

16.      Defendant MFLLC has been the plaintiff in more than 2,000 collection actions against Illinois residents.

17.      Defendant MFLLC is a "debt collector" as defined in the FDCPA.

18.      Defendant MFLLC transacts business in Illinois.

19.      On information and belief defendant MFLLC has no employees.

**Midland Credit Management**

20.      Defendant MCM is a Kansas corporation with its principal place of business at 8875 Aero Drive, Suite 200, San Diego, CA 92123.  MCM transacts business in Illinois.  Its registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

21.      Defendant MCM is a collection agency and collects the charged-off debts held in the names of NCC, MFLLC  and other subsidiaries of Encore (described below).

22.      Defendant MCM is a "debt collector" as defined in the FDCPA.

**Encore**

23.      MCM, MFLLC  and NCC are under common ownership.  Both  are subsidiaries of Encore,  a  publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

24.      Encore describes itself as  "a leading accounts receivable management

3

firm" and a "purchaser and manager of charged-off consumer receivables portfolios." (Form 8-K filed by Encore with the SEC on March 3, 2005).

25.     On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios." (Form 8-K filed by Encore with the SEC on March 10, 2005).

26.     Encore "acquires its receivable portfolios at deep discounts from their face values using its proprietary valuation process that is based on the consumer attributes of the underlying accounts." (Form 10-K filed by Encore with the SEC  for the year ending December 31, 2006, original p. E).  By "deep discount" is meant 3.0 to 3.36% of face value.  (*Id.*, original p. 28).

27.     Encore states that it is responsible for developing collection strategies. Thus, on March 3, 2005, Encore stated to public investors that:

> Our fourth quarter performance capped a very strong year for Encore, as we generated record levels of collections, revenues, and earnings per share....  We were able to achieve this strong growth despite scaling back on our purchasing of new portfolios throughout much of 2004 in response to less attractive pricing in the marketplace. Total purchases during 2004 were $103.4 million compared to $89.8 million in 2003. We continue to effectively develop alternative collection channels, such as legal and agency outsourcing, which increase our ability to penetrate our portfolios further....

The statement was made by Carl C. Gregory, III, then-Vice Chairman and CEO of Encore Capital Group, Inc.  (Form 8-K filed by Encore with the SEC on March 3, 2005).

28.     Encore is also responsible for raising money to purchase the charged-off debts.

29.     Encore has various subsidiaries and affiliates, such as NCC and MFLLC, take title to the debts it purchases.

30.     On March 3, 2005, Encore CEO Gregory stated in an earnings conference call:

> It's notable that we achieved this strong growth despite scaling back on our purchases of new portfolios for the better part of 2004, because of a less attractive pricing environment. As we have mentioned many times, one of our competitive

4

advantages is our varied business model that makes use of several different collection channels. During the fourth quarter we continued to see increased production out of our legal channel and our contingent agency outsourcing channel, which was developed earlier in 2004. For the full year, our collections through alternative channels, with the exception of the sales channel, more than doubled.

Turning to the purchasing market, our purchases for the first three quarters of the year were relatively modest, because of what we deemed to be a lack of opportunities that met our high standards. The market continues to be highly competitive, and it's looking like it could remain that way for quite a while. Accordingly, we have adjusted our strategy to reflect the current environment. We determined that we should not bypass profitable opportunities simply because they could not generate the high level of returns we have typically demanded, there are sufficient opportunities to purchase portfolios that can be nicely profitable for the Company. And in the current environment, it's in our best interest to acquire these portfolios rather than waiting for prices to come down.

With that being said, we invested $46.1 million in new portfolios in the fourth quarter, at an average purchase price of 3.86 percent of face value. Almost all of these purchases were credit card portfolios and that's where we found the most attractive opportunities in the fourth quarter. These purchases were made with our former credit facility that expired at the end of the year. We were able to modify the terms of that credit facility during the fourth quarter, to put a ceiling on the total interest that we will have to pay on these portfolios. The lower interest expense associated with these portfolios will help offset the higher prices, and the resulting lower collection multiples and enable these portfolios to still generate nice profits for the Company.

31.     On August 3, 2004, Encore CEO Gregory stated in another earnings call:

We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.

The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.

The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in

new ways that will be more effective.

We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external legal, and our recently developed agency outsourcing strategy.

32.    Encore's involvement in the collection process is such as to make it a "debt collector" as defined in the FDCPA.

33.    All of the defendants herein are under common control as well as ownership, with common or overlapping officers and directors.

## FACTS RELATING TO PLAINTIFF SYLVERNE

### 2006 lawsuit

34.    On or about Feb. 23, 2006, defendant Midland Funding NCC-2 Corp., represented by the Blatt, Hasenmiller law firm,  filed a complaint and attached documents in the Circuit Court of DuPage County, Illinois against plaintiff Sylverne, seeking to collect a credit card  debt allegedly incurred for personal, family or household purposes.   A copy of the complaint, which sought $2,086.11,  and accompanying documents, including a "Form 409" affidavit, is in Exhibit A.

35.    The "form 409" affidavit, executed by one Nancy Vanzee, an employee of MCM, states:

a.    "I make the statements herein based upon my personal knowledge."

b.    "That by virtue of such relationship and my employment with Midland Credit Management, Inc., I have personal knowledge of all relevant financial information concerning Midland Credit Management, Inc's account number 8510S03348", including . . .";

c.    "that the defendant did fail to make payments on the account";

d.    "That the final statement of account reveals that the defendant owed a principal balance of $2,086.11 on 2005-12-27; and that

such balance will continue to earn interest at a rate of ____% as an annual percentage rate calculated as required by the federal Truth in Lending Act, until judgment is entered herein. . . . I affirm that the final statement of account is true and correct."

e.     That "defendant has, in all things, failed or refused to make payments as demanded by plaintiff."

36.     On information and belief, MCM directed or caused the filing of the lawsuit.

37.     The lawsuit was dismissed in July 2006 after Ms. Sylverne paid an appearance fee, retained counsel, and moved to dismiss the complaint.

### 2007 lawsuit

38.     On or about Oct. 29, 2007, defendant Midland Funding NCC-2 Corp., this time represented by another collection law firm, Adler & Associates, filed another complaint and attached documents in the Circuit Court of DuPage County, Illinois against plaintiff Sylverne, seeking to collect the same credit card debt as the 2006 lawsuit. A copy of the 2007 complaint, which sought $2,817.39, and accompanying documents, including a "Form 409" affidavit, is in Exhibit B.

39.     This "form 409" affidavit attached to the 2007 complaint, executed by one Amy Berschelt, another employee of MCM, states:

a.     "I make the statements herein based upon my personal knowledge."

b.     "That by virtue of such relationship and my employment with Midland Credit Management, Inc., I have personal knowledge of relevant financial information concerning Midland Credit Management, Inc's account number 8510S03348", including . . .";

c.     "that the defendant did fail to make payments on the account";

7

d.    "That the final statement of account reveals that the defendant owed a principal balance of $2,794.32 on 6/30/2000; and that such balance will continue to earn interest at a rate of 5% as an annual percentage rate calculated as required by the federal Truth in Lending Act, until judgment is entered herein. . . . I affirm that the final statement of account is true and correct."

e.    That "defendant has, in all things, failed or refused to make payments as demanded by plaintiff."

40.    On information and belief, MCM directed or caused the filing of the 2007 lawsuit.

41.    The 2007 lawsuit was dismissed in January 2008 after Ms. Sylverne paid an appearance fee and retained counsel.

42.    The statements in the 2006 "Form 409" that the "final statement of account" showed that Ms. Sylverne owed a principal balance of $2,086.11 on December 12, 2005 and upon the Feb. 23, 2006 filing of the 2006 lawsuit, and that she had failed or refused to make payments, is not consistent with the statements in the 2007 "Form 409" that Ms. Sylverne owed $2,794.32 on June 30, 2000, and that she had failed or refused to make payments.

43.    The discrepancy cannot be accounted for by any payments.

44.    On information and belief, the "Form 409" affidavits are signed by MCM employees who have no personal knowledge of anything.

45.    The statements in the 2007 "Form 409" affidavit filed against Sylverne that the affiant "make[s] the statements herein based upon my personal knowledge" is false.

### FACTS RELATING TO PLAINTIFF DAVIS

46.    In October 2007, plaintiff Davis received by mail a motion for the entry of judgment on the basis of the complaint and "Form 409" affidavit attached as Exhibit C.

47.    The lawsuit had been filed by MFLLC a year earlier but has never (to this

8

day) been properly served on Davis.

48.    A return of service was filed in March 2007 purporting to show substituted service on some person who Davis has never been able to identify and who was not a member of Davis' household.

49.    The lawsuit and motion sought to collect a credit card debt allegedly incurred for personal, family or household purposes.

50.    The "Form 409" affidavit, executed by one Bernice Thell, an employee of MFLLC, states:

    a.    "I make the statements herein based upon my personal knowledge."

    b.    "That by virtue of such relationship and my employment with Midland Credit Management, Inc., I have personal knowledge of all relevant financial information concerning Midland Credit Management, Inc's account number 8511280025", including . . .";

    c.    "that the defendant did fail to make payments on the account";

    d.    "That the final statement of account reveals that the defendant owed a principal balance of $4,826.33 on 2004-02-24; and that such balance will continue to earn interest at a rate of _____% as an annual percentage rate calculated as required by the federal Truth in Lending Act, until judgment is entered herein. . . . I affirm that the final statement of account is true and correct."

    e.    That "defendant has, in all things, failed or refused to make payments as demanded by plaintiff."

51.    On information and belief, MCM directed or caused the filing of the lawsuit.

52.    On information and belief, the "Form 409" affidavits are signed by

MCM employees who have no personal knowledge of anything.

53.    The statements in the "Form 409" affidavit filed against Davis that the affiant "make[s] the statements herein based upon my personal knowledge" is false.

54.    Ms. Davis was required to retain counsel to quash the purported service and oppose the entry of judgment, which was done in November 2007.  Since that time the lawsuit has languished unserved.

### FACTS – GENERAL

55.    The information that defendants receive concerning a credit card debt is so minimal that defendants cannot lay the foundation for and attach an account history or similar business record to their complaints.

56.    As of late 2007, NCC was filing about 1,000 consumer collection cases per month in Cook County, Illinois alone, and additional cases in DuPage and other counties. MFLLC was filing cases at a similar rate.  Other cases are filed in the name of MCM (over 1,000 during 2007 in Cook County, Illinois alone).

57.    On information and belief, Encore purchases the time-barred debts, transfers them to NCC, MFLLC and other subsidiaries for the purpose of suit, and funds such activities.

58.    On information and belief, each of these filings had attached a "Form 409" affidavit similar to those in Exhibits B-C and containing the same statements quoted above.

59.    Each of these affidavits was prepared in the same manner by an employee of MCM who had no personal knowledge of any facts relating to the debt.

60.    On information and belief, defendants arrange for MCM to have minimal net worth, in an attempt to insulate themselves from the consequences of their conduct.

61.    The purpose of the affidavits was to facilitate the ministerial entry of a default judgment if the defendant failed to appear in response to either real or "sewer" service.

62.    It is the policy and practice of defendants to nonsuit cases in which the

consumer does not default or agree to pay.

63.    On information and belief, one or more officers or in-house attorneys of Encore was aware of the "Form 409" affidavits as a result of prior litigation and allowed their use to continue.

64.    Plaintiff Sylverne's claim herein is based solely on the 2007 affidavit, the earlier one being referred to in order to show the inconsistencies with the 2007 affidavit. Plaintiff Davis' claim is based on the motion for entry of judgment received in 2007.

## CLASS ALLEGATIONS

65.    Plaintiffs bring this action on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

66.    The class consists of (a) all natural persons (b) sued in the name of NCC or MFLLC or MCM  (c) in an Illinois court (d) where a "Form 409" affidavit was attached to the complaint, and (e) the suit was filed on or after a date one year prior to this action, and not more than 20 days after the filing of this action.

67.    The class members are so numerous that joinder is impracticable.

68.    On information and belief, there are more than 50 natural persons sued in the name of NCC or MFLLC or MCM in an Illinois court where a "Form 409" affidavit was attached to the complaint, and the suit was filed on or after a date one year prior to this action, and not more than 20 days after the filing of this action.

69.    Based on an examination of computerized court records, it is estimated that there are at least 10,000 class members.

70.    There are questions of law and fact common to the class members, which common questions predominate over any questions that affect only individual class members. The predominant common questions are:

a.    Whether defendants have a practice of filing false "Form 409" affidavits.

11

        b.        Whether such practice violates the FDCPA;

        c.        Whether such practice violates the Illinois Collection Agency Act.

71.     Plaintiff's claim is typical of the claims of the class members.  All are based  on the same factual and legal theories.

72.     Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

73.     A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.  Many debtors may not realize that their rights are violated.

## COUNT I – FDCPA

74.     Plaintiffs incorporates paragraphs 1-73 by reference.

75.     The misstatements described above violate the FDCPA as constituting a "false . . . representation or means in connection with the collection of any debt" (§1692e), a false representation of the "character" of any debt (§1692e(2)(A)), and "use of any false representation . . . to collect or attempt to collect any debt . . . " (§1692e(10)).

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the class members and against defendants for:

        a.        Statutory damages;

        b.        Actual damages;

        c.        Attorney's fees, litigation expenses and costs of suit;

        d.        Such other or further relief as the Court deems proper.

## COUNT II – ILLINOIS COLLECTION AGENCY ACT

76.     Plaintiffs incorporates paragraphs 1-73 by reference.

77.     This claim is against MCM only.

78.     MCM is a licensee under the Illinois Collection Agency Act, 225 ILCS

425/1 et seq.

79.    Defendant MCM violated the following provisions of 225 ILCS 425/9 by filing or causing the filing of the "Form 409" affidavits:

> **. . . (31) Engaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public.**
>
> **. . . No debt collector while collecting or attempting to collect a debt shall engage in any of the Acts specified in this Section, each of which shall be unlawful practice.**

80.    A private right of action exists for violation of the ICAA. *Sherman v. Field Clinic*, 74 Ill. App. 3d 21, 392 N.E.2d 154 (1st Dist. 1979).

81.    Plaintiffs and each member of the class were damaged as a result.

WHEREFORE, plaintiffs request that the Court grant the following relief in favor of plaintiffs and the class members and against defendant MCM:

    a.    Compensatory and punitive damages;

    b.    Costs;

    c.    Such other and further relief as is appropriate.


                        s/Daniel A. Edelman
                        Daniel A. Edelman


Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## **JURY DEMAND**

Plaintiffs demand trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\20645\Pleading\Complaint -- 2 pltfs_Pleading.wpd